Third, please call the next case. 115-1549, Jury Commander Cruises, is meeting the owner of that district. Counsel, you may proceed. Good morning, Your Honors. Counsel, Edward Zappel on behalf of the Plaintiff Appellant Petitioner in this matter. The issue before us really resolves around whether or not the Plaintiff Petitioner approved of a permanent total disability claim. And I submit to you, when I got the decision, I scratched my head and continued to be puzzled by the arbitration and commission decision here. Particularly the commission's finding that there was no opinion that the petitioner was disabled or incapable of working. This is a 53-year-old woman who worked a very part-time job for a bus company. A couple hours in the morning, working as a bus monitor with disabled children. She'd go back home for lunch, come back for a couple of hours later in the day on a part-time basis. She slipped and fell in December of 2009 and injured her back. And she had significant injuries to her low back that resulted in numerous surgeries. The first one was a three-level decompression and fusion in April of 2010. It was successful for relieving her right leg radiculopathy, but it did not resolve the low back pain. And unfortunately, she developed an immediate left foot drop. That condition resulted in a second surgery in October of that year with a neurosurgeon by the name of Dr. Dixon. He performed an L5S1 laminectomy, a sectomy for an anatomy, inserted a cage into the back, but it didn't relieve her low back complaints or her left leg radiculopathy. There's no question that she had a serious trauma. There's no question that she had surgeries. The commission apparently found that the claimant was capable of performing sedentary employment without endangering her health. Your physician, Stentenberg, said the opposite. The commission hung its head, as I understand it, on Drs. Bernstein and Noren. Well, not Dr. Noren. Right. So why couldn't they do that? Well, if we look at the evidence here, Dr. Noren solved the petitioner on one occasion for less than 10 minutes. And Dr. Noren says, based on what, I have no idea. What did Dr. Bernstein say? She's capable of sedentary. What did Dr. Bernstein say? In terms of her restrictions? No, whether she was capable of sedentary work. He said she was capable of sedentary work. He certainly did. And so did Bailey. It's not in the commission's decision anywhere. Yes, it is. Yes, it is. But he did agree with Dr. Noren. He and Bernstein both opined that she could work in a sedentary capacity. And Bailey specifically said, and that was Walker's finding, and I think he's correct, Bailey testified she was capable of sedentary work. Of course she testified to that, because she never looked at the treating records. She testified in the cross-examination. What you're talking about is, wait, Susan Entenberg has never found anybody who's capable of working, and Bailey, I think, has never found anybody who wasn't. So, I mean, we use what we use, right? Well, Bailey never talked to the petitioner, never interviewed the petitioner. Bailey didn't even know what the Dictionary of Occupational Titles was, and she certainly never looked at any of the treating records here. What they did, with respect to the vote counselor, and this addresses the argument of the Odd Lot Prim Total Award, there is a claim for Odd Lot Prim Total. There's also a claim for Permanent Total Benefits based upon Dr. Currie and Dr. Dixon's opinions. But with regard to Deanna Bailey, I think her testimony is very unpersuasive and not credible, as shown by the fact that she didn't look at the- Well, the Commission found that Bailey testified that it claimed to possess transferable skills for which there was a stable market. Did Ms. Entenberg conduct a job search of any kind? No. She conducted a job search. She conducted a labor market evaluation as to what the petitioner said. Well, Bailey says the same thing was done. And it occurs to me that what you've got here is you've got weight. You've got Bernstein. You've got the other doctors saying Noreen capable of sedentary employment. You have Bailey saying transferable skills. You've got Entenberg and a treating physician saying incapable of work. There is no job for her. And who gets to make the decision of which one is the truth teller or which one should be relied on? Well, a valid question, but you have to look at the totality of the situation. If we look at the time as to when Deanna Bailey was involved, that was a last-minute, last-ditched effort to avoid the Permanent Total Disability Award. She appeared not in response to the request for vote assistance. She didn't appear in response to the response preparation of a vote report or a written outline of vote. They never did any of that. She appears on the eve of trial with a last-minute labor market survey where she comes up with two occupations for the petitioner to work in, one of which she admits on cross-examination. There are no positions and there is no stable market for a dispatcher. The other position she's talking about is a clerk. She comes up with four jobs as a clerk, all of which petitioner applied for, none of which responded to her application for work, and all of those four clerking positions, Your Honor, have skill-set requirements that exceed her abilities. She only worked one prior job before 17 years as the bus monitor. She never worked with computers. She never worked with Microsoft Word. And the clerk position, working as a switchboard operator, is completely beyond her abilities. She had never worked as a switchboard operator and wasn't familiar with any of those operations. So we've got Anne Bailey saying that there's a stable labor market out there because I found four clerking positions for the petitioner to work at, all of which require computer skills, none of which she has any training. This is a high school graduate who worked one prior position before this part-time job with the bus company. The argument about the odd-lot permanent total is not even mentioned anywhere in the commission decision. The testimony of Sue Enberg, the testimony of Deanna Bailey, none of that's mentioned in the decision whatsoever. The main thrust of our argument was that the commission erred when they said there is no opinion that the petitioner was incapable of working. That opinion appears in the record on page 902 from Dr. Dixon, who says in October, petitioner is totally disabled from work. In October, and again in December of that year, 2011, Dr. Currier says this is a permanent condition. Petitioner has proved a prima facie case for permanent total disability benefits. Even beyond that, with the testimony of the vocational expert, it's clear that no stable labor market exists for the petitioner here. Her work prior to the bus was strictly in a small photography office that did not even have a computer system. Ask this 56-year-old woman at the time to now start work in a different capacity altogether without any of those transfer of job skills that Sue Enberg indicated in her report. Bailey seemed to believe that she possessed sufficient computer skills as evidenced by her Facebook account that she could do data entry, file organization, and records management. Right. And we introduced evidence at trial of her Facebook account, which was the equivalent of pictures from vacation. Everything you're telling us to do is re-weigh the evidence. That's exactly what you're telling us to do. And all of this was known to the commission. And the commission had to make a determination as to who they were going to credit. And in this particular case, evidently they credited Bailey, they credited Bernstein, and they credited Noreen. And they didn't credit Dixon. They don't even mention Deanna Bailey or Susan Enberg whatsoever. Well, do they have to? No, but you say they credit them. I don't know how they could possibly credit them when they haven't even mentioned them. No, no, I say they credit Bailey, they credit Bernstein, they credit Noreen, don't they? I mean, they've adopted their positions. They've adopted Dr. Noreen, who saw the practitioner. And they've ignored the other pain management physician that treated her for over a year who says she's permanently disabled from work. Now, maybe that's way beyond this. When you say they ignored him, why do you suggest they ignored him? Because they didn't talk about him? No, they ignored him for the following reason. If you look at the decision of the commission, this is Appendix 9 in my brief. The commission said the physicians expressed an opinion as to petitioners' ability to return to work on October 14th when Dr. Dixon wrote she was totally disabled from work. The commission said that's the last notice of any opinion regarding her inability to work. And that's absolutely incorrect. Subsequent to that October note from Dr. Dixon, we have the October 20th note from Dr. Curry and the December 12th note from Dr. Curry. What did Dr. Curry say? He's permanently disabled. Yeah, she has permanent disability. He didn't say she was permanently and totally disabled, did he? No, Dr. Dixon says she's totally disabled. Dr. Curry says she's permanently disabled. He says her disability related to her back is permanent. The commission goes on to infer that petitioner didn't rebut the opinion of Dr. Noren. Again, petitioner was not released to go back to work. Petitioner did not complete a functional capacity evaluation. Respondent did not provide any vocational rehabilitation report ever in this case. At the last hour, they hired Deanna Bailey. At the last moment, they got Dr. Noren to look at the petitioner and say she could go back to sedentary work. Based on what? There's no evidence whatsoever she was capable of sedentary work. But even at that point, November of 2011, after Dr. Noren says she can go back to sedentary work, Dr. Curry responds to that and says no, she's permanently disabled. What did Dr. Bernstein say? Dr. Bernstein said don't do the surgery. Did he say anything about sedentary work? I don't recall. It's not in the decision by the commission. I think it's in the evidence, though. I don't recall. It's not in the decision. Dr. Bernstein said she's capable of sedentary work. Again, I would submit to you for no other basis, no functional capacity evaluation to support that, no objective basis for that opinion. He's strictly giving that opinion based on a Section 12 examination. The commission says that the treating physicians, Dr. Dixon and Dr. Curry, their ability to opine as to petitioner's workability was beyond their area of expertise. How does that possibly make sense? When we have one pain doctor, Dr. Curry, but they're believing the other pain physician, Dr. Noren, a Section 12 physician that saw a petitioner for less than 10 minutes, we're going to rely upon that physician and ignore Dr. Curry, who has the same credentials? We're going to ignore the neurosurgeon that operated twice on the petitioner? Well, your argument has some intuitive appeal, but the problem is isn't it up to the commission? Do we substitute our judgment for the commission by the argument? Well, 10 minutes, yeah, it makes sense. He didn't have the same substantive evaluation, but how do we do that without substituting our judgment for the other commission? Well, there's no question that the standard is a manifest weight of the evidence here. But when the commission comes out and says that there is no evidence provided by the petitioner, that she's incapable of working, that is 100 percent incorrect on the evidence presented. That's why the case should be reversed. That's why I ask that the appellate court here reverse this decision regarding the work of the petitioner. When Bernstein examined her in October of 2009, he testified that the discogram did not reveal pain at L3, L4, L4, L5, showed only partial concordant pain, L5, S1. He wouldn't recommend surgery, found her to be at MMI, and said she could return to full-duty work. When it came to November 3rd, Bernstein notes that she walks with an angled gait, demonstrated diminished reflexes, comes to the conclusion that after the examination, the results of diagnostic testing that were benign, found the claimant to have reached MMI and she was capable of working in a sedentary capacity. That's exactly what Dr. Bernstein said. That's not what the commission relied upon in determining that petitioner was entitled to make an assessment. I'm only telling you that that's what's in. So don't start saying that there's nobody that said she couldn't, that she was capable of working. Bernstein said it twice. No, what I said was the commission said petitioner failed to prove she was incapable of working. Dr. Curry and Dr. Dixon both opined that. I acknowledged Dr. Noren's testimony and Dr. Bernstein's. The commission relied upon Dr. Noren and modified the arbitration award to extend benefits up to the time of the hearing. They drew the line in the sand at that point, which was the point in time that we had the hearing, subsequent to Dr. Noren's opinion that petitioner could return to work in sedentary fashion. Again, I submit to you the commission did not look at the opinions of Dr. Curry from October of 2011 or December of 2011 regarding the rebuttal of Dr. Noren's opinion to go back to work. The final issue that we have here is an issue of penalties, and I think that one's fairly straightforward. The history of this case is that there were prior 19B hearings, two of them, and they both dealt with the issue of causation, and both of them were found in favor of the petitioner, that this slip and fall on ice was compensable in the proximate cause of the petitioner's back injury. Despite the two prior 19B hearings, respondents continued to deny the claim. They failed to pay the extensive medical expenses. They failed to pay the TTD benefits. They failed to pay the maintenance benefits. Why are penalties appropriate in this case? I think the reason is quite clear when you look at the testimony of Dr. Noren and his reliance upon the prior Section 12 report of Dr. Butler. Dr. Butler, two years prior to Dr. Noren's testimony, issued a report that said that the slip and fall on the ice was a proximate cause of her back injury. Dr. Noren agreed on the cross-examination with the opinions of Dr. Butler. So, for two and a half years, respondents had this opinion from Dr. Butler that the case is compensable and causally related, and they continued to deny the TTD. They continued to deny the maintenance. They continued to deny the extensive medical expenses, and I think pursuant to Section 19K and 19L, petitioners entitled the penalties for respondents' unreasonable denial of benefits. Thank you. Thank you, Counsel. Counsel, you may respond. Thank you, Your Honors. If it may please the Court. Counsel. As the Court has made clear, what is asked here is that the Court re-weigh the evidence that was presented to the Commission. The defendant, Applebee's, would respectfully suggest that the Commission weighed all of the evidence before it and came to the correct conclusion that petitioner failed to prove her entitlement to a permanent and total disability. As we know, there are two ways to do that. The first is by a medical proclamation that you are incapable of work. In this case, there was no doctor who said explicitly that petitioner was permanently and totally disabled. Doctors at various times said petitioner was unable to work, and treating doctors said at various times that petitioner was permanently disabled. And the Commission recognized that petitioner was permanently disabled when they awarded 60% loss of use of the man as a whole. What treating physicians did not state was that petitioner was permanently and totally barred from ever pursuing any gainful employment for the remainder of her life. By contrast, Respondent presented the extensive deposition testimony of both Dr. Bernstein and Dr. Noren. And the Commission found this testimony to be credible, and specifically the Commission adopted positions by Dr. Noren and Dr. Bernstein, even when they did not specifically attribute those positions. I would note Archrator Williams' comments specifically about the lack of foundation for the treating doctor's opinions, and that the treating doctor's opinions fell outside their expertise. But what counsel did not continue with is the full remainder of that sentence. He said it was not within their expertise of protecting petitioner's safety and health, and thereby defining her physical limitations. What the Archrator was saying in that regard is that because the notes in particular, the To Whom It May Concern letters, are so lacking in specificity, so lacking in underlying detail, so lacking in medical conclusion, that they failed to exercise their duty as treating physicians to define what Ms. Meyer is capable of doing. And I believe that was what he was referencing when he said they were not within their expertise. He was not saying these determinations are outside their expertise. He was saying that these doctors did not execute that expertise by writing simple To Whom It May Concern letters that did not provide the level of detail, the level of analysis, the level of physical findings on examination, the opinions about diagnostic tests. Let's be a little more specific as to what's actually in the arbitrator's decision that the Commission did not retreat from. The arbitrator's decision does not say that the petitioner did not produce any evidence that she was permanently and totally disabled. The arbitrator's decision is that she failed to prove it, and then goes on to say that the petitioner can perform sedentary light employment without seriously endangering her health or life. She failed to prove that she conducted a genuine, diligent search of employment, and to the extent that it's been suggested that they ignored her doctor's opinions. The next sentence is, the doctor's apostrophe, S apostrophe, opinions to the contrary are not consistent with the evidence. And it's nowhere in the Commission's decision to suggest that the Commission retreated from those findings of the arbitrator. In fact, the Commission's decision makes some comments and then goes on to say that it affirms and adopts all remaining findings contained in the March 12, 2012 decision of the arbitrator. So contrary to the representations, it did in fact, the arbitrator did, and they adopted it, consider that she did have opinions to the contrary. They just rejected them. Correct. But I would say, Your Honor, that when I said there were no opinions on permanent and total, that the doctors addressed pieces of that analysis individually, but I do not believe there is an opinion from a treating physician within the record that explicitly states the petitioner is permanently and totally disabled. As I said, the doctors do say she is permanently disabled, which the Commission recognized with their award of permanent disability. And they do say at some points that she is unable to return to work. But in the time and place of the time of trial, there is, I do not believe, an explicit opinion from a treating physician that she is permanently and totally disabled. And in fact, when you look at some of the other notes from the treating physicians at or near the time of trial, it does suggest that the petitioner is actually more capable than what is represented in that she is found to have good sensation to pinprick, no atrophy, no loss of strength in the extremities, all suggesting, as Dr. Bernstein and Dr. Norton found, that a sedentary job might be a possibility. The other way to prove a permanent and total disability is obviously the eye lock. And here, let me answer one additional question. I believe Dr. Norton did testify that he spent between 45 to 60 minutes with the petitioner. And I understand that's not the same as a year-long relationship, but it's certainly more than the casual 10 minutes that's been suggested. The second way to prove a permanent and total disability is through the eye lock approach. Again, the Commission was presented with two competing experts, Ms. Bailey and Ms. Entenberg. Ms. Entenberg really conducted no formal vocational assessment in the context of, for example, testing or transferable skills analysis. She went off the premise that the petitioner was not released to work and basically said, in light of that, there's nothing for me to do. She did eventually address the idea that the petitioner had no transferable skills, but then also admitted that she had made no real efforts at testing or deeper inquiry in order to assess what those transferable skills might be. By contrast, Ms. Bailey did attempt to extrapolate some transferable skills and did identify two potential job categories. I believe it is incorrect to state that she admitted that there was no stable labor market for the dispatcher job. What she said was that in that short snapshot window frame where she did the labor market survey, there were no jobs available. That does not mean that that job market is completely unavailable, but only for that brief period of time. What was the evidence as to the basis for Ms. Bailey's opinion that Clayman had transferable skills? Was there anything beyond this testimony that she was able to maintain a Facebook account that went into the opinion that she had transferable skills? Ms. Bailey extrapolated from the position that was described that she had held with the photography studio, which was both a production and an administrative position, and she extrapolated from those what probable work capabilities would be as well as work capabilities that she would have had as a student bus assistant, and she utilized those. In fact, at least one of the jobs, and possibly two, always were required was a high school diploma, which Ms. Myers certainly has. So the premise is that I believe that at the very least a labor market was identified based upon the physicians who released her to sedentary duty. And once you accept the credibility of those physicians, then obviously there has to be some assessment of what labor market is out there, and I would respectfully suggest that Ms. Entenberg did not perform that. Ms. Bailey did, and to the extent that that was the evidence that was presented to the commission, that was the evidence they ruled on. And in terms of this idea that this was a last-minute report, I would note that Ms. Entenberg only rendered her opinions within, I believe, 90 days prior to our expert rendering hers. So this was not a last-minute rush per the City of Chicago case to shore up a defense against a permanent total disability. This was the natural sequelae of the series of evidence based upon petitioner presenting a prima facie case and responding to it. What is your argument about the penalties and fees? I think we understand your argument on the manifest way. Our argument, Your Honor, is that as early as 2009, Dr. Bernstein, as you know, examined her multiple times. And as early as 2009, he opined that the proposed surgery was unreasonable and necessary, and he articulated a number of reasons why, including her history of smoking, the fact that they couldn't identify the correct pain generator, et cetera. Based on his recommendation that she not undergo the surgery, he found no further care was necessary, and he found that she was able to return to work. It was on these opinions that Respondent relied in continuing to deny benefits. Does Dr. Noren enter into this equation at all? Did he have something to indicate or say about the need for further medical treatment? Well, Dr. Noren did not address this until 2011, close in time to the trial. But he did also agree that all she required was palliative treatment. He said in retrospect the implantation of the spinal cord stimulator was not a good idea, and I believe he also suggested in retrospect that the surgery was probably not an excellent idea either. But it is Dr. Bernstein that the commission relied upon, because he was the one that rendered those opinions consistently beginning in 2009 at the point in time that further benefits were denied. If there's nothing further from your honors, we would respectfully stand on our brief and request that the commission of the decision be affirmed. Thank you. Thank you, counsel. Counsel, you have five minutes in reply. Very briefly, I don't stand before you and ask you to reweigh the evidence that's presented here. What I ask the appellate court to do is to consider the evidence that the commission never considered. The commission decision quite clearly states, the commission takes notice that the last state either of petitioner's treating physicians expressed an opinion as to her ability to work was on October 14th of 2011. That's not true. What came after the opinion that she was permanently and totally disabled? After October, what were the opinions? That she had permanent disability? The opinion of Dr. Corey on October 20th. And what did he say? She's totally disabled and that's permanent. Or did he just say that she had permanent disability? He says with respect to her back, she has a permanent disability. Right. He didn't say she was permanently and totally disabled. He said she has a permanent disability. Correct. People who have permanent disabilities can still work. Understood. There's a difference. So the commission only said the last time any doctor said she was permanently and totally disabled was the October to whom it made concern letter. So the question I have for you is what doctor after that date said she was permanently and totally disabled? Well, that's not what the commission said. The commission said the last notice they had as to the physicians expressing an opinion as to her ability to work. Well, permanent and total disability is ability to work. Permanent disability doesn't mean she doesn't have the ability to work. There's no way this commission ever looked at the October 20, 2011 note from Dr. Curry or the December 12, 2011 note from Dr. Curry. They went out of their way to say it was not even considered or looked at. Well, where did they say they didn't consider or look at it? Because they say the last note they looked at was October 14 prior to that. Counsel, you play fast and loose with this record. Let's read exactly what they said. The commission take notice that the last date either of petitioners treating physician expressed an opinion as her ability to work was on October 14, 2011 when Dr. Dixon wrote a letter addressed to no one in particular that indicated that the petition was under his care and was totally disabled from work. They never said, they never said that there wasn't an opinion that she had a permanent disability. They just said there was no opinion from the doctor after that date that she was incapable of working. Now, we do have opinions from Dr. Bernstein after that that said that she was capable of sedentary work. And I'll take you back to the arbitrator's decision which they adopted. The doctor's, S apostrophe, opinions to the contrary are not consistent with the evidence. And that is in response to a statement, the petitioner can perform sedentary light employment. So, you know, it's not the same thing to say a person has a permanent disability. It's not the equivalent of saying they're permanently and totally disabled from working. We have a lot of petitioners here. That's why you get permanent partial disability. Sure, Dr. Dixon says petitioner's totally disabled from work. Dr. Curry, the pain management physician working in concert with Dr. Dixon says the permanent disability is permanent. We have the two working in concert. And Dr. Bernstein, who examines her twice, once says she's capable of full employment. Never should have had this operation. Operation is not correct. And when he examines her in November, he turns her around and says capable of sedentary employment. Now, who makes a decision as to who to believe? The commission is to try her effect. And they did. Yes, but they didn't look at the opinion subsequent to October 14th. Who says they didn't? The commission. They said the last note was October 14th. Counsel, you and I don't seem to read the same. The only thing they said was there was no opinion after October 14th that she was permanently and totally disabled from working. No, it says it speaks to her ability to work. And Dr. Curry addressed it twice as to her ability to work. Let me read it to you again. Let's try this. Maybe we can understand this. The commission takes notice that the last date either petitioner's treating physician expressed an opinion as to her ability to work was on October 14th, when Dr. Dixon wrote a letter addressed to no one in particular that indicated the petitioner was under his care and was totally disabled from work. That is the only opinion up to, that was the last time she offered an opinion that said she was totally disabled from working. The opinion that comes after that merely says she has a permanent disability. Now, it's one thing to argue that the commission probably should have accepted the opinions of the treating physician over the Section 12 examiner. That's a fair argument. But it's not fair to make a representation that after October 14th, some doctor said she couldn't work because no doctor had said it, or to deny that there were opinions that she could work after that day because they're in the record. Now, fair is fair. Your Honor, in all honesty, when I read that sentence over and over as I have, it infers to me that the commission did not consider Dr. Curry's subsequent opinion. That infers to you, but it doesn't say who doesn't. Your time is up, Your Honor. Thank you, Your Honor. Thank you, Counsel Bull, for your arguments in this matter. It will be taken under advisement and written disposition shall issue.